Case number 13-5153, William E. Shea, Appellant v. John F. Kerry, Secretary of State in his official capacity. Mr. Thompson for the Appellant, Mr. Valdez for the Affiliate. Good morning. Good morning, Your Honor. May it please the Court, Joshua Thompson on behalf of Appellant William Shea, have asked to reserve three minutes for rebuttal. Shea challenged the Department of State's decision to make entry-level Foreign Service officers eligible for mid-level placement on the basis of race. The fundamental issue in this case is whether Shea must bear the burden of proving the Department's race-conscious conduct was illegal or whether the Department must demonstrate, through a race-conscious action, was legal. Before we get to that, your brief joke in brief, page 9, accurately quotes Donald Douglas as requiring that the plaintiff have applied and qualified for the job which they required to seek an applicant. And after citing that, you never again return to the issue of application.  We did make an application for, certainly not for the race-conscious plan, nor for the non-race-conscious plan. That is correct, Your Honor. And there are cases indicating that one cuts slack to a plaintiff who has not made an application, where difficulties are presented. And we're not sure, at least I'm not sure on this record, what difficulties were presented. But the test there is made reasonable effort to apply, make his or her interest known. So, could you just lay out what you see as the factors presenting difficulty for him in making an application? And second, what reasonable efforts he made to fulfill those difficulties? I think this Court's decision in Douglas v. Donovan declares that if an employee is denied the opportunity to compete for placement, which there is no dispute here that Shea was denied the opportunity to compete for placement within the mid-level affirmative action plan. He denied that opportunity. That is sufficient. But he wasn't. I mean, it gives denial a different meaning to say that he was denied the opportunity to compete for the non-race-conscious parallel plan. Yes, Your Honor. The plans are not the same plan. I understand that. And I believe that they're... They certainly operate together, right? I think that they have significant differences in his preclusion from being able to compete for the mid-level affirmative action plan is significant. It's significant in a number of respects. The Department makes the error in its brief a couple times of saying that when you're an entry-level officer, you choose your cone that you want to pursue. That is simply untrue. You are... When you're an entry-level officer, for the first five years, you are uncone. So, the Certificate of Need Program, where there's one need in a particular cone within the Foreign Service, Shea was precluded from applying for mid-level applications in those cones which were not... Did not have a Certificate of Need. And he had the opportunity, were he of a different race, to apply to all of these other cones. But because he was of the wrong race, the cones were limited, and he could... He was denied the opportunity to compete for mid-level promotion in other cones. But I thought there was a Certificate of Need in the consular cone. There was a Certificate of Need issued in the consular cone, but that does not mean that Shea was allowed to compete for those cones where there was not a Certificate of Need issued. But I thought we were talking about consular cones. Is that incorrect? That is incorrect, Your Honor. I believe that Shea should have the opportunity to compete for mid-level promotion in any cone. He ended up in the consular cone only after first being admitted to the administration cone, only after first asking to be placed in the political and economic cone. The fact that 20 years down the line he ended up in the consular cone does not mean that he should have been denied the opportunity to compete for mid-level placement in these other cones. And simply by virtue of the fact that there was one Certificate of Need available in this for mid-level placement in those cones, which there was not a Certificate of Need issued. And that is... At least it was unclear to me for the record what precipitates a Certificate of Need being issued. Parts of the record suggest that that's a sort of an applicant's project process, not something that comes down on high from the particular cone. Is that correct? I do not believe that is correct, Your Honor. I think it's precisely the reverse of that. I think when the State Department identifies deficiency in the mid-levels in a particular cone, that it seeks out applicants that may qualify outside of the Foreign Service to apply for those mid-level positions. So, because Shea was not in... The mid-level affirmative action plan, of course, is completely different. There you get automatic qualification for any cone. And not only did... That's not the only significant difference between the two programs. I think another significant difference is the race-neutral mid-level placement program where the Certificate of Need is necessary. There, of course, there's only the slot available for that Certificate of Need. So, the individual has to compete against many other people of all races. Whereas, let's say that Certificate of Need is filled by a person of any race, a person of a race that qualifies for the mid-level affirmative action plan can still apply for that cone even after the Certificate of Need is filled. So, the competition is much less great because they have less competition. That takes us to the merits, but in terms of what Shea did and might have done, it doesn't help us. As far as I can tell from the record, the first action we have on his part showing concern about this problem is in 2001, which is eight years after the program has been terminated. So, if we're proposing the question, which some of the circuit courts have, to the probability of his applying having known of the race-neutral program, it sounds that the probability is very low. I don't think that is a relevant consideration here, Your Honor, when this court has clearly held that the denial of the opportunity to compete is sufficient to show a Title VII violation. The fact that he didn't bring suit eight years later does not preclude his claiming that his paycheck is significantly less by virtue of that original discrimination. Is there some practical, just apart from the law for a second, is there some practical reason not to apply for the race-neutral route to a mid-level position? I think there, I think, after consulting with my client, he was simply not aware of the race-neutral program, Your Honor. It was, as I said earlier, a targeted program where the Department, it's my understanding the Foreign Service would go out and target specific individuals for that. He was well aware of the mid-level Affirmative Action Plan, knew that he did not qualify as a white male of Irish descent, and that is the reason why he specifically did not apply for the race-neutral program, where there was only at least one or two slots where it was... It looks like in the record that other individuals who didn't qualify for the Affirmative Action route became aware of the race-neutral route and then sought a way to get their application put in the right place. And I think looking at those applications, there's a few applications in the record, and they're letters where one of the applicants has written to state saying, thank you for contacting me and notifying me of this application. I will now pursue the mid-level Affirmative Action, I'm sorry, the race-neutral program for mid-level placement. So there's no dispute that the mid-level race-neutral program existed. Shea, from what he tells me and what I can tell from this court, was not aware of it. The extent to which that was made aware to entry-level Foreign Service officers, most of whom would never qualify for mid-level placement. Shea would qualify because he was in the Naval J Corps, he had a law degree, and he had these other qualifications. But as a general practice, the mid-level Affirmative Action Plan is going to be available to every current Foreign Service entry-level officer, whereas the race-neutral mid-level placement is simply not going to be available to every Foreign Service officer. So I think he did not apply for it, he did not know of it. So can I ask another question along these lines about what he was or wasn't supposed to do at the time to indicate a requisite level of interest? You can have a situation in which it's absolutely obvious that somebody's going to want to apply for a position because it involves the very same set of responsibilities, but you get paid more. At that point, economic rationality just kicks in and says, well, the person would like to have the position that pays more. But more often, what happens is, when you get paid more, it's because you have to do more. And so it doesn't follow necessarily as a matter of course that somebody's going to want to have the greater responsibility that might beget the greater compensation. And I think here, you have that kind of situation, I think, because the mid-level Foreign Service officers, more was expected of them. So you could envision a situation in which somebody applies for the entry-level position, but they don't actually want to have the greater responsibility that, true, enough, it begets greater compensation, but they don't want to have that. And so what do we look at in the record to know that Shea, at the time, was actually interested in having the higher-level position that came with greater responsibility and greater pay? I think that's the improper question to ask, Ryner. I don't think there is necessarily anything in the record that would demonstrate Shea's desire at that time to move up to the mid-level and get more pay. You're absolutely correct. There were more responsibilities. I think what the proper inquiry is whether the Department of State discriminated against him on the basis of an appointment decision. Here, it was an employment decision that affected pay. There's no dispute about that. And that is sufficient to make out his unabashed case under Title VII. Suppose you have it undisputed in the record. In fact, he files an affidavit that says, I had no interest in being a mid-level employee because it was really – I just didn't feel qualified for it. It was – and not qualifying in the sense of formal job qualifications, just that I wasn't ready. I felt I needed more experience, and so I never wanted to have the mid-level position. Then I don't think he can bring a case, right? He can't bring a challenge to a policy that actually wouldn't have affected him because he had no interest in the job. I'm not sure that's true, Your Honor. I think that this court has held that if a promotional opportunity is simply denied to by virtue of his race, he's unable to apply, the court does not inquire into whether he would have attained that position or whether he would have applied for that position. In most of our cases, I think what we're getting at is there's been some indication by the employee of an interest. That's all we're getting at. Your Honor, I think this court's decision in Douglas decided just five years ago makes clear that that is not a requirement, that it is – So what if the Affirmative Action Program wasn't in the Foreign Service at all? It exists in the Treasury Department. Right. And Shea applies for a job in the Foreign Service. I mean, by your understanding of Douglas, he was still denied an equal opportunity to apply for the Affirmative Action Program in the Treasury Department. It's just we have no reason to think he has any interest in being in the Treasury Department at all. I don't think that that's an employment decision that affects him under Title VII, Your Honor. Well, affect doesn't affect anything. It's only if we have some reason to believe that he at least would have – was likely to apply that it could be said to affect him at all, meeting the causation requirement standard. Your Honor, I believe that this certainly did affect him. He was precluded the opportunity to compete with the significant differences between the two plans. And I think that there's no dispute that those are real substantial differences. If he wanted it. And I think – I mean, your answer may be that he did want it or that it's obvious he wanted it or there's things in the record that show us that he, in fact, wanted it. I guess I'm just not entirely – it doesn't seem right to me, or at least it's not obviously right to me, to say that even if he didn't want it, he still gets to bring the claim. Excuse me. Although I understand that to be your position. I think to answer your Treasury Department hypothetical, Your Honor, I don't think that that within the meaning of Title VII is an employment decision that affects him. An employment decision that affects him is someplace where he has employment. His employer is the Foreign Service. And that was the decision – their decision to preclude him from applying. Well, I mean, you can obviously – you can obviously manipulate the hypothetical so that it's different divisions within the same agency. But you still – at some point, it seems like the plaintiff would need to show that the plaintiff had an interest in the position as to which he was denied an equal opportunity to compete. Otherwise, the fact that there's in the abstract a policy that could have affected him if he was interested wouldn't give rise to a cognizable claim because he actually didn't have a desire to have that position. I think in this scenario, I don't think we need to go down that road because we have a scenario where the employment decision is made by his direct employer for a position that he was clearly qualified to be in. In that scenario, where you have an employment decision by your boss, where people in your class are receiving that race-conscious promotion, that – So then if I can just understand your position, so you would say that even if it was undisputed in the record that he didn't want the position because it came with attendant increased responsibilities, that he could still bring a claim? I think given the fact that it was in his particular class, given the fact that it was his employer, the fact that he was precluded, I do not believe that he needed to apply, that he needed to express a willingness to apply. And to draw some parallels to equal protection jurisprudence where the Supreme Court says you don't need to submit yourself to an unconstitutional process in order to challenge the constitutionality of that process. Similar here. I'm just saying that people who think it would be great to go to the University of Texas Law School can just file suit and say, if I applied, I would be discriminatorily treated. You weren't saying that, were you? I'm saying if the university – So your argument sounds as if it goes that far. I don't think it does, Your Honor, because I think Title VII constrains the injury that we're alleging here. In the constitutional scenario where you're applying for admission to the University of Texas Law School, you have to have some sort of injury in fact and to bring your equal protection claim. And if the University of Texas is using rape, the fact that you can apply to that university should be enough. You do not, in fact, necessarily have to apply as long – you do not have to submit yourself to an unconstitutional process in order to challenge the constitutionality of that process. That's Northeast Florida contractors. It comes up frequently in contracting cases. But I agree with that and it seems intuitively apparent that that would apply if it would be futile to apply. So you could just say, I don't want to go through the empty exercise of applying because it would be futile, but yeah, I'd like to have it. But it's the like to have it that keeps tripping me up. And is your – maybe I can ask the question this way. If one were to think that the law required the plaintiff to demonstrate an interest in the position that he's been precluded from competing on an equal basis for, are you saying that then your client can't win because he didn't have that interest? I'm not saying that, Your Honor. I'm saying that at that point it becomes a factual dispute upon which the district court has not ruled. I believe that there is evidence in the record that Shea would have, had he known about it, would have applied for that. He did know. You're taking the position that he didn't know about it, though, right? I'm not taking that position, Your Honor. I think the record says that. He came to know about it, clearly. Right. At least through the course of the litigation he came to know about it. Well, he must have known about it when he filed his administrative complaint. That's part of the litigation, yes. That he knew about the race-neutral? No, not the race-neutral one because at this point what we're talking about is whether he's – I think I'm not talking about that. Did he at least know about the opportunity to – the denial of the opportunity to compete for the race-based slot? Absolutely. He knew about that at the time that he applied to the Foreign Service. The mid-level affirmative action plan was well known. Right. So he knows that there are mid-level positions to which certain individuals can directly go. Then the one question I think is, is he interested in actually having one of those mid-level positions given that it has different responsibilities? And as I understand your argument, it is that it doesn't matter if he's interested. He can still bring a claim. And then my question is, suppose that one were to think it does matter if he's interested, then can we say from this record that he was in fact interested or do we just not know or – Your Honor, it wasn't disputed in the court below to the best of my knowledge. I don't know the contents of the record to answer that question faithfully. Okay. I see my time is almost up. Keep going. Instead of moving to the Ricci question, well, I'd like to just make one point on the Ricci issue. Yeah. If this court were to suppose for a moment that the Department's mid-level affirmative action plan were pursued for constitutional reasons, in other words, to avoid an unconstitutional disparate impact and to avoid past racial discrimination, if that were its purpose – I mean, the Department argued that it's to pursue racial balancing, which we know is unconstitutional. But let's say that they actually chose a constitutional purpose. Then Ricci says that a decision to avoid or to remedy an illegal disparate impact must satisfy the strong basis and evidence test. So if – Is there a court that has understood Ricci to apply not to changes in a race that has already been run, producing winners and losers, but to apply to a new race, a new competition of positions going forward? To the best of my knowledge, Your Honor, this court will be the first to decide that issue. I do not know of any other court that has – Well, doesn't that suggest that the other circuits are following the Supreme Court's frequently-issued injunction that we're not supposed to overturn its precedents, such as Johnson? We're supposed to leave it to do that. I don't think it does, Your Honor, because the converse is also not true. There is no circuit court that has held that quotes Ricci, Johnson survived. And I think the circumstances of Johnson and Ricci are so similar, it's hard to argue that Ricci did not overrule Johnson on that point. The majority of Ricci didn't feel any need to discuss Johnson at all. You're right, Your Honor. And the discussion by the dissent is peripheral. Also true, Your Honor. However – That doesn't sound like a court driving a major hole, or at least consciously driving a major hole in Johnson. I think, Your Honor, that Ricci cannot be squared with Johnson in this respect. To the extent that remedying an illegal disparate impact must satisfy a strong basis in evidence test, Johnson, for that point, can no longer stand. Johnson was a race-conscious – or a gender-conscious affirmative action plan that was through a competitive process, much like we have here. And at the end, instead of – much like we had Ricci, instead – and Ricci, instead of throwing out the test results, it promoted people above. That distinction seems to be an illusory one to say that Johnson survived simply because throwing the test results out, you give people a boost at the end. Okay. Can I ask this question about the relationship with Ricci and Johnson? So in Ricci, the court says, our analysis begins with this premise. The city's actions would violate the disparate treatment prohibition of Title VII, absence on valid defense. And so it's starting with the premise that, but for some explanation, the action violates Title VII. Johnson doesn't have that presumption. And your argument, I think, is that now Johnson must be jettisoned because every case is governed by that presumption. But I don't think Johnson has to be read that way because Johnson can just say, no, it's not the case that the entity's actions would violate the disparate treatment prohibition absence on valid defense. We have to engage in the affirmative inquiry to determine whether there's a violation to begin with. Yeah, Your Honor, I think – I don't read Johnson – I don't read Ricci that way. I read Ricci as saying that any facially discriminatory conduct, which we have here, that that must be – that that is the premise that disparate treatment applies. And once that premise is hit, that is when the strong basis and evidence standard kicks in. And here we have a facially discriminatory conduct. Frankly, the McDonald-Douglas Justice Court has held previous cases. McDonald-Douglas doesn't really work that well in the case where you have a facially discriminatory conduct because we don't need circumstantial evidence. We have direct evidence here of discriminatory – But there's a difference, I think, between facially discriminatory and invalidly discriminatory. And what our cases have said and what the Supreme Court's cases have said is that just because a plan like the one at issue here or at issue at Weber or Johnson does discriminate in some descriptive sense, it doesn't make it invalidly discriminatory. Whereas the premise of Ricci is that there would have been a violation. Yeah, right. Right, Your Honor. I think Ricci is controlling on that point. I think that – or you could read Ricci to say – to constrain Johnson to showing what does it mean in Johnson to have a valid defense. It can't be the case – and here we can move on to the Johnson portion of our argument – that simply holding up a napkin saying we have an affirmative action program is enough. You have to show a valid affirmative action program. And that's for, I think, one point that may not come clear in the brief is that there is absolutely no evidence in the record, not the GAO report from 1989 and not the multi-year affirmative action report from 1990. There is no evidence that shows a statistical imbalance of any race other than Asian Americans in 1989 for the affirmative action. They don't have the factual predicate, any statistical showing that there's an imbalance here. And that's by and large – For mid-level. For mid-level, precisely. Right. Which is the focus of the affirmative action plan. They have put the focus on the mid-level because there is no imbalance in the mid-level with respect to any race by 1990. They cannot say that this is a valid affirmative action plan. But I read the government to be shifting the focus from the mid-level as an end in itself and taking the cue given by Judge Lambert in his opinion, which is that the mid-level is a pipeline to the senior foreign service. And there was an imbalance in the senior foreign service. And the purpose – the now stated purpose of the plan, regardless of what was in the minds of the architects at the time and the basis upon which it can be upheld, is that the pipeline had to improve in order to remedy the disparity, the under-representation in the senior foreign service. You're right. That is now the argument that the department puts forth. I think there's a couple of responses to that. One, I don't think that that's what the courts are to look to when you're talking about a manifest imbalance in a traditionally segregated job category. I think you have to look to where the preference is given. And here there is no imbalance. As this court said, you have manifestly no imbalance at all in the mid-levels. I think the second point is, as you pointed out earlier, not only is the mid-level significantly more job responsibility than the entry-level, but the senior foreign service is a completely different ballgame. And to say that you are going to create more senior foreign service officers by over-inflating the mid-levels past its natural balancing point – assuming balancing was a legitimate purpose to begin with – it's simply untrue. You need Congress to vote on these. You need presidential appointments. It is so fraught with uncertainty and subjectivity that you cannot say with any degree of specificity that skipping over these entry-level levels and directly into the mid-levels, where in entry-levels you're going to learn a lot of the basics of foreign service work, that by skipping over that you're going to increase representation at senior levels. There's certainly no evidence in the record of that. And I think it is simply illogical to say that over-inflating the mid-levels will – Well, there is some evidence in the record. You may not think it's enough, but there is evidence in the record about increasing the probability that there would be more senior level if you had a different pool from which to draw. I mean, there is evidence there. Testimony before Congress, but in any event. Your Honor, I think the congressional testimony speaks in favor of Shea. The congressional testimony is almost exclusively related to entry-level officers with some discussion of senior and almost no discussion of mid-level. Moreover, another – Except as I referred. Fair enough, Your Honor. I think one last point with respect to the Johnson issue and with respect to the congressional record is that the State Department here did not employ race-neutral alternatives. Go to the Common and the Brewer reports on page 413 through 417. They list a litany of race-neutral alternatives that the Department could have used here. As is, of course, said in Hammond, that must be the first resort. They cannot employ the race-conscious plan when all of these neutral options, as given by Congress and given by these reports, were available to it. Instead, the Department – So it has to do all of them? I mean, I just need to be clear, because it said it did some, and it was doing others. I'm sorry, Your Honor, I didn't catch the question. The Department – I said, your position is, then, that it has to do all of those that are in the Thomas and Brewer? I just need to be clear on your position. No, it's not my position that they needed to employ each of those. It's my position that they needed to consider some. But the record is clear they considered some. I mean, they did a number of things. You may not think it's enough, but they did things. Your Honor, I think the record is clear that when they adopted the mid-level affirmative action plan, they went race-conscious, and there is no evidence in that record that those race-neutral alternatives, some 30, were considered by state before it chose to go race-conscious. In fact, state went race-conscious three years before that. Can I just get back to the senior foreign service as the ultimate end, if you view the mid-levels of the pipeline? So, conceptually, you don't disagree with the proposition that if you increase underrepresented populations' appearance in the mid-level, then that creates the possibility of ascension to the senior service. Conceptually, that just seems like mathematically it's true. And then the question becomes, is that actually a viable pathway? And it also seems undisputed from the material that the lion's share of the positions that are filled in the senior foreign service come from people who are within. So, it's the experience that one gains from participation as a mid-level foreign service officer that is perceived to prepare you to ascend to the senior foreign service. So, it's also the tried-and-true pathway. Does that seem right to you? I think with one notable exception, Your Honor, I don't think it's the tried-and-true pathway to jump the entry levels and get to the mid-level. I think the tried-and-true pathway is to go through the entry levels, develop the experience, get placed in the cone that you are most appropriate for, develop many years of mid-level experience, and then get promoted to the senior foreign service. So, your view is that in order to actually do right by the State Department's own policies, someone would have to go through the entry level and get the experience there, or else they're not going to be sufficiently well-qualified to go to the senior foreign service from the mid-levels? I wouldn't say necessarily. I would say that in order to justify their race-conscious mid-level program because of an imbalance in the senior levels, if we can see that there's no imbalance in the mid-level, that they must demonstrate a little bit more evidence than simply the mathematical probability that there are more people in the mid-levels, there will be more people in the senior levels. They have to show that connection that this mid-level affirmative action program actually will increase. So, in other words, the mid-level affirmative action program wasn't broad enough. It should have expanded to encompass entry level two? Is that the way you would look at it? Because then you would have representation in the entry level two. So, the fault of the program is that it was too narrow? I think the fault of the program is that it wasn't targeting where the imbalance existed. I think, as we said in our brief, if they wanted to increase representation in the senior levels, then maybe a tailored preference at the senior level decision-making process would make sense. But I don't think you can constitutionally, or under Title VII, over-inflate, through racial discrimination, these fully represented levels in order to get to that unbalanced level. Even though in Weber, it seemed like what was going on is that there was an over-inflation at one level acknowledged. It had to be under the record that the target percentage exceeded the percentage in the population. But the whole purpose of that is to create a broad pool. Right. But the preference was at the level where the discrimination was occurring, where there was traditional segregation, where the steel workers had, for years, excluded blacks. And it was to run out, by its own terms, once parity was achieved. Okay. Thank you. Thank you. All right. Counselor Barabarino? Good morning. Good morning. My name is Daryl Valdez, and I'm with the United States Attorney's Office, and I represent the State Department in this case. I apologize for my voice. I'm kind of losing it. Does the record have anything on either the State Department's revelation of the race-neutral program, or Mr. Shea's awareness of it? Your Honor, there's nothing in the record. Nothing? Not either of those? Correct. Mr. Shea, in the record, it is that Mr. Shea claims he did not know of the race-neutral program. And that is the only fact in the record we have. There's no fact about whether or not he wanted to apply or he had a desire to. So his application says something like, I apply for, I'll get the numbers wrong, but level six or any other position for which I am qualified. Doesn't it say something like that? Or any other level? Does it say that? No, I'm asking you. Your Honor, I am. You don't know? It is not in the record, correct. I don't think his application is in the record. I'm sorry. His application is, but I don't believe that's on his application. All right. Your Honor, if I may, I want to point out real quick that with respect to the certificate of needs and the race-neutral program, in both of them, you could apply at any time whether or not there was a certificate of need even established in a section. You could still apply. In fact, that's what Anne Hasluck did in that is in the record. She applied for the mid-level race-neutral program. After she was accepted, they then found where her talents would be best placed, and then they went and obtained the certificate of need for her. So there didn't have to be a certificate of need. What was her basis for applying for it? I'm sorry. I believe, if I'm correct, Your Honor, it was that she had heard that there was a race-neutral program. She inquired, or I'm sorry, she heard about the affirmative action program. She inquired as to whether or not she could apply, and they told her, no, there is another program that you can apply to. So it was her inquiry about the race-based program that led to her information. That is correct, Your Honor. Do we have any basis for inferring a similar inquiry by Shea? Would or would not have led to the same result? Did you just pick the right person to ask? The problem being, Your Honor, is that the system was there. The program was there. If he asked if there was a program in which he could apply to the mid-levels, then the answer would have been, of course, yes, there is. We have a career placement program. In fact, if I may, Your Honor, even minorities who applied to the affirmative action program and who were qualified still didn't get in. There had to be the certificate of need for a minority under the affirmative action program was not based purely upon their minority status. It was also based, was, quote, as established by the goals set forth in the applicable affirmative action plan. So if there were no vacancy or if there was no under-representation for a minority or if there wasn't a minority needed to increase representation in the section, they wouldn't get a certificate of need. They couldn't be placed. And in fact... Wait a minute. I don't understand. Why did they need a certificate of need? I thought the whole point of the affirmative action plan was that you don't need a certificate of need. Well, it's that which you can apply, but it says, and if you read on pages... I'm sorry. The 1987 plan was at a record of 146... 142. Or 146. And the 1992 plan is at 441. Both of them state that the placement of a minority is based upon the goals set forth. Oh, correct. Yeah, but that's saying, then, that the imbalance criterion itself is applied on an applicant by applicant basis in some way. That is correct. And that was made even more so, Your Honor, in the 1992 program, where the affirmative action program says, with each time you hire, you need to look at what are the needs or what are the affirmative action goals of the goals of reaching... So, I saw that argument in your brief, and I guess... And the district court alluded to it in its decision, too. But I guess from the record evidence that I looked at, there's no way to understand concretely what that meant. I mean, in other words, the argument you're making is that although the affirmative action program was open to all minorities, and there may have been a lack of under-representation or even over-representation with respect to certain populations, that really, at the end of the day, all that the state department focused on was those particular populations as to which there was under-representation. That seems to be your point. No, Your Honor, if I may... It's kind of the goals of what it is. So, it would be, one, is where there was under-representation in the mid-levels, or two, where there was under-representation in the senior levels, as would be... Could have been assisted or kind of addressed by promotions in the mid-levels as... No, but I thought the point is, in your brief, you said that the department set the percentage goals only for those groups it found there was this statistical disparity, based on its own workforce studies. Correct, Your Honor. And if I may actually point out something, though. In counsel's reply brief, they talked about, on page 216, about how there was no under-representation of black males, and that they had hired a black male under the concept of color. Actually, Your Honor, counsel was pointing to the wrong site. I think he cited page 218, which is a specialist. The concept was at 216, which is the generalists, and in page 216, black males were noted as being under-represented. That's okay. I want to understand exactly what you're saying here. So, in your brief at pages 40 to 41, you say that the 9092 Affirmative Action Program corrected for the weaknesses identified by the GAO, and specifically identified the manifest imbalances in each specific minority group, within which foreign service conal system, as compared to more timely data for a comparator population, and then set goals for only those under-represented groups. Correct. And other than just the statement in the plans that something could be effective, you know, you should be looking at the groups for which there's under-representation. What concretely happened with that supposed targeting of specific minority groups? Because you also acknowledge, right next to that, right below that, and although all minorities could apply, so all minorities could apply to the program, but then supposedly there's some sort of targeting that goes on after that, where you only set goals for those under-represented groups. And where do we look to see practically what that meant? Because all I got from the record was that the program is open to all minority groups. There's some statement in the plan to the effect that, you know, look at the groups for which there's shown to be under-representation, and then it identifies particular groups. But it never tells anybody what to do with that. Well, yes, if you look at page 441 of the record, at the very bottom, Certificate of Need and other documentation, it talks about for the minority groups. It says the – as the annual hiring goals established by the Secretary constitutes the certificate of need for such candidates. So you have to look at the annual hiring goals of these sections as they come out to determine what – Wait, where are you looking on 441? 441 at the very bottom. Okay. Under Certificate of Need and other documentation. And then the same thing with – And where are the annual hiring goals? I'm sorry? Where are the annual hiring goals? That we didn't have, Your Honor, but those were not in the record. Those were not presented in the record. So how do we know that the annual hiring goals go to specific minority groups as opposed to what I think has been the general understanding of the case so far, which is that the hiring goals apply to minorities writ large? Well, Your Honor, that – we couldn't find the annual hiring goals because of the lack of time – because of the passage of time. But in this case, since Johnson and Weber was applying, it was the plaintiff's burden to show that the hiring was – that the statistics were against us and that it was not narrowly tailored. And he didn't show that. He couldn't show that. He didn't go back and make any statistical analysis show that any of the hires were in violation or in areas where there was either correct representation or over-representation. So – I just need to be clear, though. There is in the record a page that shows various categories by race and ethnicity and gender. Yes, Your Honor. And then it has percentages for some of those. Are not those the hiring goals? No, Your Honor, they were not. Because – But what are those? They were – I think you're talking about the GAO report where there's a – Could be. I think that's – I believe that's what you're talking about. And it talks about whether it was under or over-representation. I also remember in the Department of State's workforce study – Yes. All right? They had these percentages. Yes, Your Honor. And then that the Secretary had issued some directive saying we need to do more, we need to do more. Yes, Your Honor. And so we have these percentages. Your Honor, those are – That there were some instructions to supervisors that when vacancies come up, you should give consideration to the fact that we're trying to increase – but is that it? Yes, Your Honor. If you're talking about pages 530, 531, those pages, those are – they're talking about – what they do is they took some of the information about how many promotions, how the percentage of people are coming in through promotions. Five-thirty? Five-thirty-one, he said. I only have 400 – oh, 654, sorry. But if you're talking about the GAO report, Your Honor, where they were talking about – where they found that there was no under – yeah, no under-representation of black males, don't forget at the bottom of that, GAO noted that it's – the data that it was using was clearly outdated. I think what Judge Rogers may be – I don't know. Five-thirty and five-thirty-one is just a spreadsheet with a bunch of statistics. Right, correct. So on – It's a spreadsheet that shows the promotion rates of how it was being promoted. So on page 234, if you look at 234 of the GAO, this may be what Judge Rogers was thinking about, because it says – this is part of the 1992 plan, I think, and it says objective – to reduce manifest imbalance of the affected EEO groups in foreign service and civil service. So it's talking about the affected EEO groups, not all minorities, but the affected groups. Correct. And then action items, foreign service generalists, and it lists some – I'm sorry, which page are you looking at? 234. Oh, 234. Yeah. And volume one. So 234, and it lists which particular groups are associated with which particular percentage. So this is not – this is subgroups as to which there, in fact, is under-representation. Correct. But again, what I come back to is that although there is this suggestion that the objective is to reduce manifest imbalance of the affected EEO groups as opposed to minorities writ large, how is this ever actuated? It's just not – other than this kind of general suggestion that the objective is to reduce imbalance with respect to these groups as opposed to with respect to minorities as a class. I was wondering why you're looking at 224 with 216. 234. 216, there's a relevant page for consular. Well, 234 is foreign service generalists. Well, it doesn't talk about – it doesn't have, like, the consular or anything. I mean, it has – of course, there's general service officers, yes, where there's black males listed as under-represented. Right. In other words, were these aspirational and nothing happened? No, I don't believe that. Well, there's some testimony. Let's see. When was the congressional testimony? That's 87-89, saying that even though the Secretary put out this letter, even though there was these exhortations, nothing changed. And so then you have the GAO report, then you have Congress telling the State Department to do more. Then you have the EEO telling – you have a CEE telling the Department. But it is hard to figure out what happened. Yeah, it is. But from the report, you can gather, Your Honor, that what the State Department did is they kind of did a multifaceted approach. They increased – they kind of improved their recruiting process, which – That didn't work. Well, it didn't work before. That's correct, because they recruited kind of – as the record shows. The point is, the record doesn't tell us. Is that correct? What actually happened after these goals were set? Other than who was hired and who wasn't? That is correct, Your Honor. Where do we know who was hired and who wasn't? If you go to record at – I'm looking at 489 and I think that we list – I'm sorry, Your Honor – 517 and 516. We talked about who all was hired under both the Minority and Mid-Level Program and who was hired under the Race Neutral Program. So what I'm having a little trouble following is, if it's true that the program, in fact, at the end of the day, targeted only those specific populations as to which there was under-representation, meaning the particular populations listed at 234 and, as you say, at 224, if it's true that it targeted only those, then why are you only making an argument with respect to the Senior Foreign Service? Because then you would have had – Your Honor, I'm sorry, and I apologize if you got that impression that I'm only making an argument with respect to Senior Foreign Service because I'm not. I'm making an argument with respect to both the mid-levels and the seniors because there was found – the GAO report found that there was under-representation – actually, all the reports found, including the Grammar report – found that there was under-representation in both the mid-levels and the senior levels. But with the mid-levels, at least as of 1992, which is, I think, the relevant numbers because those are the most latent time numbers, there wasn't under-representation vis-à-vis minorities at large. There was under-representation with respect to particular populations, as the 1992 plan itself indicated.  I think that there was under-representation of minorities at large. The only time – But I thought with respect to some minority populations, there was, in fact, over-representation at the mid-levels. No, no, no, Your Honor. In fact, the only place where there was full representation was at the lower junior levels, the entry levels. But I believe that there was – as you can see from the 1990 report, there was still quite a bit of under-representation. Look at page 216 and those. There was quite a bit of under-representation of minorities in the mid-levels. But then why doesn't – first of all, 224 is Foreign Service Specialists. I don't think that's the right – we're looking at Foreign Service Generalists. Right, that's 216. So 222 says, Conal Analysis for Foreign Service Generalists, and it gives us particular populations, white females, black females, Hispanic females, consular white females, American Indian males. So it's not including every minority population. Presumably that's because as to some specific populations, there was not – not only was there not an under-representation, but there may have even been an over-representation. But putting that to one side, it looks like under the State Department's own analysis, there wasn't an under-representation with respect to every group, that there was sub-groups as to which there was under-representation. Correct. That's correct. But I don't see your question being that – generally that there was minorities who were under-represented. The answer is yes, they were. But there were some specific groups that were not in certain areas. That is correct as well. What you need to do is you need to do the analysis for each of the areas, which Mr. Shea did not do. He didn't use it – using the timely data, census data. And so he didn't – he didn't sustain his burden of showing that this was over-inclusive and that it was not narrowly tailored. But he says the program is open to all minorities. That's true. And non-minorities are quite correct. Right. And unless there's something going on at the back end that cabins the selection only to those sub-groups as to which there's under-representation, then the program is not commensurate with the problem because it's allowing for everybody to get a leg up. Oh, no, you're right. No, no, no, no. First of all, that's not – the case law in this jurisdiction says that even though everybody can apply, it doesn't mean that it's too general in itself. It's what is the action that is being taken that makes it too general. In this case, are they putting people in places that are – they're not needed? Then it becomes too general. But opening it up to everybody doesn't mean that it's wrong. In fact, it increases the pool of who you get to choose from and where you want to put them. Just because there may be an under-representation in the finance office – I'm sorry, let's say in one of the general offices doesn't mean that that person doesn't have a good background to put them in the finance office. So it all depends on what you're looking at when you're figuring out where to put this person in the mid-level. Secondly, Your Honor, I think for the same reason why the whites could apply and anybody else could apply in the Certificate of Need program is you apply. Anybody could apply in the Certificate of Need program too, white or minority. And they're placed on where they were needed as well. So – and it was based on where they looked and where their talents were. So that didn't make that one too general. It just means that you had a bigger pool to choose from, but the action that was taken was placing them where they were needed. I think I'm missing something basic, and I'll just ask one more time, and then I'll stand down. I apologize. But I'm not talking about across jobs. I'm talking about specific subgroups. So just take the following as a given. Suppose that it's undisputed as a matter of numbers that there's great overrepresentation of Hispanics in the mid-level Foreign Service, great overrepresentation. So there's nothing that needs to be done in order to get to any sort of level that's commensurate with the qualified population writ large. But then the program is open to everybody, including the population, as to which there's great overrepresentation. Are you taking the position that it doesn't matter, that the program actually benefits everybody, even though there's overrepresentation as to one benefited population? The fact that the person is able to apply doesn't make the conduct of the program unlawful, Your Honor. It's where they've placed that person. Did they accept that person, and did they – Okay, so then I'm with you. Then where do we see that, in fact, the hiring – it sounds like what you're saying is that the ability to apply doesn't matter unless people actually hire. And what I don't understand is where in the record does it show that the hiring, the ultimate decisions, were only with respect to those populations as to which there was underrepresentation? Okay. Your Honor, in that respect, we believe that it is in the policy itself. Okay. And secondly, when you look at page 216, it shows that there was underrepresentation. Now, the only thing that Mr. Shea argues is that, as far as I understood from his reading of this, was that there was a black male that was hired into the mid-levels of the consular program at the time he came in under the program, and he claims, looking at page 218, there was no underrepresentation of black males. The problem is that 218 is not the consular program. 216 is. And 216 shows that there is an underrepresentation of black males in the consular section. It depends on the program that race-based appointments are suitable. Whenever there is a sub-segment of the foreign service that does not match, balance. Well, Your Honor, I think in this case, the evidence is... I don't think that can be answered. Well, I don't believe that that's what we've been arguing. I don't think that's been faxed in this case. This evidence shows that as far back as 1975, the records have shown that there's been this manifest imbalance all the way back to at least 1975. Let's assume it's entirely theoretical. Maybe an important theory. So long as there is manifest imbalance, to use the actual term, so long as there is manifest imbalance in the economic section of the foreign service with respect to a particular racial group, then an advantage is suitable for appointment in the economic section regardless of whether that group is fully represented, overrepresented, whatever, in the rest of the foreign service. I would have to say that probably there's some people who would argue that in some course that would find that. However, in this case, the court did not do that. It went on further and said... There's two things I'm asking. What's your question? What the program requires and would it be lawful? Oh, it requires that not only there be some imbalance, Your Honor, but there has to be some connect with some sort of discrimination in this case. In the particular... Oh, I see what you're talking about. If I can, Your Honor, I think the problem is we're getting lost in the shifting burdens here. Because in the shifting burdens here, what the government has to show is that there was manifest imbalance and that it required the necessity for the affirmative action program and that there was some sort of connection. Then the burden shifts to the plaintiff to show that it was not narrowly tailored, that maybe that there were some sections that were not underrepresented and you were still hiring in those, and therefore it was not narrowly tailored. I think you're very perverse in that situation that I'm trying to get at. Okay. The situation where there isn't, looking at the Foreign Service as a whole, imbalance. The question of whether the objective of balancing can apply within some narrow group, at least something less than the entirety of the Foreign Service, because there's imbalance there. Well, I think the answer is yes. If you found an imbalance within a section. And again, and I want to, as soon as I finish this conversation, I'm going to talk real quick about something else, about the use of the word imbalance. But I think that's correct. If you find that there is an imbalance, on the whole. Thereby creating an imbalance the other way, right? If you look at the Foreign Service as a whole. By segmenting the Foreign Service, the State Department acquires a justification for creating more imbalance in one direction than existed before. Is that right? I'm sorry, Your Honor, and I'm really having trouble following what you're saying. I'll try to make it quite simple. Let's assume there's, quote, manifest imbalance in the economic section. Yes. Okay. And there's no, with respect to this operational group, there's no manifest imbalance in the Foreign Service as a whole. You are telling me, I think, that under the plan, there can be a preferential appointment in the economic section. Is that right? If there is a history of manifest imbalance. Correct, Your Honor, yes. Manifest imbalance in the economic section. Correct. Your Honor, I think you're kind of going a little too simplistic here, I think, because the test isn't whether there's just an imbalance. There has to be something more. And, in fact, the Court did find there was something more in this case, that there was a tie-in of discrimination. And in this case, there was a fact to show that there was unequal treatment of minorities as they were being promoted all the way up. Now, in that case, Your Honor, if you're showing that just by chance, or that everything is fine, everyone else is in the economic section, and there's a manifest imbalance in the economic section, but that's not caused by, say, for instance, the fact of some sort of discrimination. But, in fact, just fewer minorities are applying for that spot. Are you saying, then, that we have section-by-section data on sections discrimination? Well, I don't think you could go overall. I think if you're going overall, then I think you're running... No, I'm not saying overall. I'm saying a particular section. If you have discrimination in a certain section, yes, I think that you can act. What you're saying is, are you saying that under this plan, it would only be a case of evidence of discrimination in a particular section that there would be application of the race-conscious plan in favor of the minority, notwithstanding the complete balance across the Foreign Service? Well, yes. I think that's part of the narrow tailoring of the program. You're saying that the record has evidence of that micro-level of discrimination. We have evidence of the discrimination, like I said, through where the plan was established at the outset about how the discrimination was occurring. Then, while it's addressing that... And that's section-by-section. There was a section-by-section analysis. Yes, your Honor, the GAO report and, I believe, the Brenda report and the other one report also took them section-by-section and said, in the specialist sections, there's under-representation, and they went through... What do you mean under-representation? You talked about discrimination. I think we talked about... You said it was based on evidence of discrimination. Well, your Honor, I think that for the purposes of asserting, of establishing the plan in the first place, it's was there discrimination to support the plan. I don't think we have to go section-by-section for the purposes of... Under the justification of the first test of Johnson and Weber. Then, when it goes to determining was it narrowly tailored, that's when you start to go by the section-by-section analysis and whether or not the conduct of the plan addressed each of those sections and was it narrow enough, was it narrowed down to address those sections where there was under-representation. And I believe that that's what the court found we did in this case, and the record supports that. I noticed in your brief, you cite Hammond on a couple of occasions, but never to distinguish it from this case. I was puzzled at that. Well, I think that Hammond applies Johnson and Weber and so on. Yes. Right. But the outcome with some statistics that Judge McCluck pointed to that seem a little hard to square with your approach here. Oh, I disagree on it. I don't think that the statistics in Hammond did not square with us. I think in Hammond, the statistics were quite broad and... I'm sorry. Were quite broad and were not specific enough for the purposes of determining whether it was narrowly tailored. Hammond seemed to take the approach that since things were okay now, that you couldn't have a plan that addressed vestiges of discrimination that continued in the department. Maybe that's what the judge said. I'm sorry. The question is, is this panel bound by approaching this case that way? In terms of its interpretation of Johnson? Well, no, Your Honor. I don't... Well, again, we're talking about the shifting of burdens. Does that think initially? No. In this case, since we are looking at overall, I think if you're saying a affirmative action plan for just one section, then I think you have to look at that section. But in this case, we're saying we have an affirmative action plan for all the minority hiring in the mid-levels and senior levels of this foreign service. And there, you're entitled to show that on the whole, on the whole, there was disparate numbers. And then, when the burden then shifts to the plaintiff to show that it was not narrowly tailored, then the question comes is, were there violations of that? And in that case, don't you think that he's citing the wrong facts? Your reading of Johnson, then, is that in the typo that I gave you earlier, the case where the numbers are disparate in a narrow subset, it is the plaintiff's burden to show that the department relies on that in making the race-based promotion. And it's the obligation of the plaintiff to show that that discrepancy is not the result. Narrowly calculated discrepancy is not based on actual discrimination. Correct. Can I just back up to the very beginning for a second, which is on the question of standing? Yes, sir. You raise a number of points in your brief to the effect that there were positions available to which Mr. Shea could have applied but didn't, et cetera, but you never actually make the argument that he lacked standing. Well, Your Honor, because the problem with the standing argument is that it didn't come about until the plaintiff raised Ritchie. Because in Ritchie, there has to have been some conduct taken against the plaintiff. Something had to be taken away from him. In this case, there was nothing taken away from him because he never applied, he never got a promotion, and they said, I'm sorry, you can't have it because we need to give it to a minority. That never happened in this case. In fact, the plaintiff has not presented any evidence that any white applicant or any white person who's qualified was denied that that was a promotion or a placement in the mid-levels in lieu of a minority. So are you taking the position that he lacked standing, or are you not contesting? We can bring that in standing kind of as more in the context of the primary patient case, Your Honor. So you think there is standing? I think he has standing to challenge the affirmative action program under Weber and Johnson, but he lacks a primary patient case. How does that meet the – how can there be a meeting of the primary – if it fails to meet the primary patient case on the question of applying, how can he meet the causation requirement for standing? Well, I think that as a minority who applied, I'm sorry, as a member of the majority who applied, and there was a provision that applied only to the minorities, I think that he would have standing to challenge it, but the question is then once he gets through the door, and again, we're talking about famous, it's just getting in the courtroom door. Once he gets in there, across the threshold, he's got to establish the primary patient case or the burdens under McDonnell-Buglis when he's going to be in the primary patient case. So we believe that – If he hadn't applied or shown that he would have applied had he known more given the State Department's disclosure, how does it meet the causality requirement? For standing, Your Honor? Okay. Well – I mean, not that your position is at all controlling this. I understand that. My problem is that we hadn't raised the standing below, and so we didn't think that it was proper to raise it again or to raise it in this one, but we also believe that – We don't think that's really – The fine distinction, Your Honor, about the distinction between the standing and the primary patient cases, I think he could bring the suit, but if he's not affected in any way by the Affirmative Action Program, then I think he lacks the primary patient case. You see, you've stated the conditions for lack of standing. He's not affected at all by the program. I'm sorry, what did you say? You just – I'm trying to quote your words exactly. He is not affected at all by the program, and you say he hasn't made his primary patient case. Yes, but the other thing would follow equally. He hasn't traveled with a causation element necessary to stand it. Well, as long as you're willing to find that he lacks the standing, I'm not going to object to it at all. But you seem to be trying an intellectual distinction. I agree. It is somewhat of an intellectual distinction, and that's why I'm thinking that we're kind of talking the distinction without much of a difference, but if you think the issue is standing, then I'll go with you, Your Honor. I understand that. You'd like to win the case. No, but the argument would be that for purposes of standing, we have to take the allegations of the complaint as true. Right. All right, and he says he's an employee. He says he's been – he doesn't use the word barred, but the affirmative action program is part of getting this job in the middle of it. And there's a hole in the brief, in the complaint, that we have been exploring extensively. And Doug Williams, in his earlier question, said, what we're really talking about is not pronunciation, but causation, standing. I'm telling you, the reason why I argued it the way we did was that reason. If the court finds that that's standing, I'll live with that. But wait, just to clarify. Yes. If it's a lack of standing, why does that end the case? Why what? Why does it end the case? In other words, if you're right that there's no premature case, then we affirm. Right. If there's a lack of – if we think that there's a question as to standing, then is the appropriate relief to affirm, or is it to send it back to allow him to do whatever he wants, introduce facts that establish his standing? Well, it just is, Joe. Once he's done his judgment, he's got to introduce the facts to show his standing. And if you find that there was nothing in the record to show standing, then I think that based on the record, the court can make that determination. I don't know. I mean, I think we, of course, often give somebody a chance if they think that the allegations are insufficient to establish standing to say whatever needs to be said. Now, maybe that as a matter of fact he can't say it because the problem is that, you know, the question is whether he was interested in applying. Then maybe if he wasn't interested in applying, and if that's a problem with standing, then he can't say it. But if he could say it, and the only failure is that he hasn't said it so far, then we typically give somebody a chance to do that. Which means we then send the case back to the district court to do another step, which I think is kind of unnecessary because I believe that the court was, the district court was correct under Webber and Johnson, the State Department was this case. Either way. We have to look at standing. I understand that, John. But I'm just saying that it's kind of a, as we call it often in the criminal side, you know, an error that, you know, I'm sorry. There's no prejudice. I'm sorry, go ahead. No, go ahead. Well, there's no prejudice. I mean, there's nothing. We're making a mistake, but it was nothing. I'm sorry? We can't do that with standing. I know. I know, John. But what I'm saying is that in this case we addressed it as privatization, and we think that that was kind of the appropriate place to place it. All right. Thank you. Anything further, quickly? No, Your Honor. With that, I think I'm going to ask the court to take a decision. All right. Thank you. All right. Counsel for appellant. Thank you, Your Honor. I'll try to be brief. I'd like to first discuss some of the imbalance issues that the court was struggling with, and then briefly touch on standing at the end. I think we can cut through the record with a couple pages. The court would look at pages 211 of the record and 210. These are the only data sets, other than the GAO report, which counsel concedes fails to show imbalance. These are the only data sets. No, he didn't concede that. Quite the contrary. The GAO report? Yes. Let's not talk about concessions. Let's make your argument. Fair enough. Then there's two data sets here at issue in this case. The GAO report at 285, which explicitly states no imbalance for four of the six races, and the data set on pages 211 and 210 of the record. If you look here at the MIZ level on page 210 for 1989, black male, Hispanic male, American Indian male, and Asian American male, each lists a number. If you then compare that to their own comparator on page 217, each of those races, every single one that I listed is overrepresented. That is the only data that they have showing imbalance at the MIZ level. Six. And each data set fails to demonstrate an imbalance. There is no imbalance here. They cannot show it. They have no evidence of it. And, in fact, overrepresentation is rampant. Can I just ask you on this data, page 216, I think comes from the same rough set of data. Maybe it's cutting it a little differently or something. But 216 says PATCO analysis for foreign service generalists, and it lists certain populations as to which there's a manifest imbalance. Absolutely. Is that because those include entry level? Both entry level and senior levels, Your Honor. It does not include MIZ level. If you only look at mid-level data, there's no imbalance. They can't point to anything in the record that demonstrates an imbalance. Okay. So you're looking at a mid-level alone, which would be FS2 through 213. Okay. Yes. And there's no imbalance there. Well, as to certain populations. As to every population that receives the preference. I thought there was at least one or two populations as to which there was underrepresentation. You may be right that there's overrepresentation as to some, but. I believe if you look at black males, they're 5.4 and 5.0 in 1989. In 1990, they're 5.0 and 5.0. The balance should be 4.5. You'd have to include females, obviously. Pardon? You'd have to include females, I think, if you're going to do a racial. Well, there was also a female preference program in place, but we haven't shown that. No, but I mean if you're going to do it based on racial classification, you'd include both males and females. That calculation I have not calculated in my head. Okay. That may be the discussion. I'd like to briefly go back to standing. As my friend pointed out, the only evidence in the records here is that Shay did not know of the race neutral program. That is the only evidence in the record. We are on summary assessment. There's nothing demonstrating that this was an advertised or known neutral program. I also would like to reemphasize that he came into the Foreign Service on Cone. They do not say that you go to the consular cone where there's a certificate of need. So when he applied, he sent his application where? I'm not sure precisely where he sent it. Well, what I'm getting at, the Department of State, assuming it has a human resources or personnel department or something like that. So your application goes in. Right. And he's saying, I want a job. That's correct, Your Honor. And for the first four to five years of your employment as a Foreign Service officer, at Level 5 and 4, I believe you jumped to Level 4 after one and a half years, as a matter of course. But after five years, that is when this coning happens. You go to a panel. If you're going to be a tenured Foreign Service officer, which my client became, that is when they decide which cone you go into. As a matter of fact, my client's first cone was not consular. My client's first cone was administrative. My client's preferred cone was not consular. My client's preferred cone was politics and economics. So there's nothing in the record to show he ever asked the question that the white female asked. I didn't. Is there anything in the record to show that he inquired about what opportunities were available and indicated his interest? That's all I just want to know. I do not know of anything in the record. All right. Thank you. The only evidence in the record is that he did not know of it, and my apparel site client had no idea that he needed to introduce that evidence when it was not disputed until this corporation was not. What? That he... Had to make a prima facie case. And that we believe he... The elements that he needed to demonstrate his desire to apply for these positions was never in doubt by the department. We certainly believe that we could produce... That you could get a stranger on the street, all right, who says, gee, I would have applied. That's all. We're trying to tie this down a little bit. I believe the tie-down and the limiting factors come from Title VII itself. All right. So it doesn't matter if you've applied or if you have any interest in applying. You still... Your prima facie case is established. I think the element that he needs to show is that opportunities within his employer were precluded from him because... Even though they weren't. They absolutely were, Your Honor. No, I'm saying there was this other program available to him. There was another program that had one certificate of need available in a cone. There was another program that had opportunities in many cones. But it's not as though, you know, Supreme Court case is talking about. He was barred across the department. That's all I'm trying to understand. I believe he was barred across many cones, flatly barred. And that is a significant opportunity to advance to the mid-level. The Title VII prohibits the state... He said he was flatly barred across the cone. But he was assigned to speak in an administrative cone. Six years down the line once he went through that mid-level. Well, he wasn't eligible before that. Precisely. But if he were of a different race, he wouldn't have been eligible. But there was that. Anyway, I get it. Okay. Thank you. Thank you. We will take the case under advisement.
judges: Rogers, Srinivasan, Williams